UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEDDY A. SCOTT,<br><br>        Plaintiff,<br><br>    v.<br><br>JO ANNE B. BARNHART,<br><br>        Defendant.<br>_____/ | No. C-05-2790 JCS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND AFFIRMING DECISION OF COMMISSIONER [Docket Nos. 18 & 19]** |

## I. INTRODUCTION

Plaintiff, Teddy A. Scott, filed a complaint seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits under Title II of the Social Security Act. Plaintiff asks the Court to reverse the Commissioner's decision and for an order remanding the matter for further administrative proceedings.

Plaintiff applied for disability insurance benefits under Title II of the Social Security Act on January 21, 2003. The application was denied initially and on reconsideration. Plaintiff made a timely request for a hearing, and a hearing was held on July 15, 2004, before an Administrative Law Judge ("ALJ") in Oakland, California. At the hearing, testimony was taken from Plaintiff and Dennis Contreras, a vocational expert ("VE"). Plaintiff was represented by counsel at the hearing. On November 24, 2004, the ALJ issued a decision finding Plaintiff was not disabled as defined in the Social Security Act and denying his request for benefits. This decision became final when the Appeals Council denied Plaintiff's request for review on May 12, 2005. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

Plaintiff filed a Motion for Summary Judgment on March 21, 2006, and the Commissioner filed a Cross-Motion for Summary Judgment on April 20, 2006. Plaintiff filed his Response to

1  Defendant's Cross-Motion for Summary Judgment on July 17, 2006. The parties have consented to
2  the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

**II.    BACKGROUND**

    **A.    Plaintiff's Background and Medical History**

Plaintiff was born on May 15, 1944. Administrative Record ("AR") at 71. Plaintiff was 58 years old as of November 1, 2002, the alleged onset date of disability. *Id*. Plaintiff graduated from high school and completed his third year of college in 1986. AR at 90. Plaintiff's past relevant work experience consists of approximately 16 years of employment as an airframe and power plant mechanic, involving duties of maintaining and repairing aircraft systems. AR at 97. This position is classified as skilled, medium exertional level work. AR at 16.

Plaintiff worked as an aircraft mechanic for Western Airlines from 1968 to 1977, and then for Frontier Airlines from 1977 to 1986. AR at 364. From 1986 to November 2002, Plaintiff worked for Federal Express ("Fed Ex"). *Id*. In November 2002, Plaintiff stopped working at Fed Ex. AR at 365-366. He testified that he stopped working due to pain in his ankles, knees, and back, as well as industrial asthma and arthritis in his hands and joints. *Id*. Plaintiff worked one 80-hour week as an equipment operator at a Livermore golf course from January 13, 2003 to January 19, 2003. AR at 105. He claims that the pain after one week forced him to stop working. *Id*.

        **1.    Plaintiff's Back Pain**

According to Plaintiff, his back was first injured when he was lifting a heavy object at work in January of 1988. AR at 194. He took a week off from work to recover. *Id*. On July 14, 1988, after his symptoms had subsided, Plaintiff slipped from a truck ramp while performing his normal work duties. AR at 151, 194. He landed on his feet, but "a shock of impulse was transmitted up his back" that has led to years of back pain and right leg pain. *Id*.

On August 12, 1988, Plaintiff underwent a "Magnetic Resonance Imaging Study of the Lumbar Spine." AR at 161. The findings of the study were that the conus appeared to be normal, but Plaintiff was found to have:

> a moderately large herniated intervertebral disc at L4-5 . . . encroaching upon both lateral recesses . . . . Also there is a moderately large herniated disc at L5-S1 . . . some narrowing of the intervertebral foramen on the

2

1  right side at L5-S1. The other foramina appear to be clear. There
2  appears to be slight desiccation of the disc at L4-5 and L5-S1. There is no evidence of bone erosion or bone destruction.

3 AR at 161. On October 21, 1988, Plaintiff was evaluated by Dr. Robert Chow who concluded that

4 Plaintiff had:

5  a significant S1 nerve root compression with absent right ankle jerk along
6  with a positive straight leg raising test and suggestive weakness of the extensor hallucis longus . . . an MRI of his lumbosacral spine . . .
7  indicated that the patient had a medium sized herniated disc at L4-L5 bilaterally and a centrally herniated disc at L5-S1 on the right side.
8  These findings are compatible with clinical picture of significant S1 nerve root compression due to herniated disc.

9 AR at 195. On November 28, 1988, Dr. Darrell Hayes stated after a visit from the Plaintiff that "Mr.

10 Scott has continued working although he remains very limited with regard to lifting, bending, sitting

11 or prolonged standing. A good deal of question remains unresolved with regard to future treatment

12 and expectations with regard to the lower back." *Id*.

13  Plaintiff had back surgery in the form of a laminectomy/diskectomy in April of 1989 at

14 Summit Medical Hospital in Oakland, California. AR at 87, 372. The surgery was performed by

15 Dr. Delmar C. Sander. AR at 91.

16  In early 2003, at the time Plaintiff briefly went to work as an equipment operator at a golf

17 course, Plaintiff again experienced severe back pain. On January 20, 2003, he saw Dr. Allen Chiu

18 for treatment. AR 241-242. Dr. Chiu prescribed Motrin, recommended that Plaintiff engage in no

19 lifting and gave Plaintiff a work excuse for one week. *Id*. Plaintiff was to return in one week if the

20 problem did not improve. *Id*. Plaintiff did not return to work.

21  On February 7, 2003, Plaintiff called Dr. Michael Louie, his primary physician since April

22 1999, to schedule an appointment, leaving a message that he had been experiencing "severe" lower

23 back pain for "1 month." AR at 239. Plaintiff saw Dr. Louie the same day, who referred Plaintiff

24 for x-rays. AR 220-221. The report stated as follows:

25  Normal exam. Five lumbar-style vertebral bodies demonstrate
    normal stature and alignment. Disc spaces and facet joints are
26  normal. No evidence of either acute abnormalities or degenerative
    changes. S1 joints and portions of the pelvis imaged are also normal .
27  . . . Normal L-S spine series.

28 AR at 221.

3

On April 21, 2003, the Social Security Administration carried out a "Physical Residual Functional Capacity Assessment" on Plaintiff, based on a primary diagnosis of "back pain" by Dr. Camille Williams, with the following results:

> EXERTIONAL LIMITATIONS: None established . . . . acute onset back pain should recover within one year . . . . POSTURAL LIMITATIONS: None established . . . . MANIPULATIVE LIMITATIONS: None established . . . . ENVIRONMENTAL LIMITATIONS: None established . . . .

AR at 297-304. Dr. Williams noted, "clmt had acute onset back pain should recover within one year." AR at 298.

On June 24, 2003, Dr. Louie signed a Physician's Supplementary Certificate for the Employment Development Department, diagnosing Plaintiff with lumbago and stating that due to low back pain and asthma, the "estimated date patient (even if still under treatment) will be able to perform his/her regular customary work" was September 1, 2003. AR at 225.

Plaintiff testified at the administrative hearing that he continues to feel "constant" back pain, that this pain interferes with his sleep and that he takes pain medications on a regular basis. AR at 366. In his "Pain Questionnaire," Plaintiff stated that he takes pain medication 3-4 times a week and sometimes wears a back brace." AR at 113-114. He stated that the pain medication relieves his pain "most of the time, within 1 to 2 hours." *Id*. He testified that ongoing chiropractic care allows him to continue to move. AR at 372.

### 2. Plaintiff's Knee Pain

On November 12, 2001, Plaintiff injured his right knee when he slipped and fell down the stairs of an aircraft. AR 289. Plaintiff saw Dr. Charles Lewis, III, in Fresno, California, for the injury. *Id*. Dr. Lewis treated Plaintiff with an ice pack and ace wraps, and prescribed Darvocet and Naproxen for pain. *Id*. Dr. Lewis noted on the day of the injury:

> He is limping quite notably with his right lower extremity . . . . Inspection of the right knee reveals marked lateral soft tissue swelling over the vastus lateralis with marked tenderness to palpation over the insertion distally at the femoral condyle. Range is from 10 degrees of flexion to 90 degrees with notable pain . . . . There is an effusion under the vasts lateralis distally over the insertion of the femoral condyle.

*Id.* Plaintiff was diagnosed by Dr. Lewis with a right knee strain and contusion. *Id.* Dr. Lewis listed Plaintiff's "Work Status" on November 12, 2001 as "[m]odified with crutches 100% of the time and sitting 100% of the time." *Id.* On the same date, Dr. Cicely Roberts reported that "[t]he right knee in three projections demonstrates no fracture or dislocation. The soft tissue planes are intact. There is no joint effusion. The visualized distal femur is intact." AR at 287.

On November 26, 2001, two weeks later, Dr. Lewis reported in a follow-up visit:

> He states that he is doing much better. He has no soreness or pain. He has complete mobility. He denies any popping or locking of the knee . . . . Vital signs are stable. Patient in no acute distress. Inspection of the knee reveals no swelling. No tenderness is noted to palpation . . . . Range of motion within normal limits without pain. Neurovascular status of the extremity is intact. ASSESSMENT: Right knee contusion and strain resolved. PLAN: Discharge from care. Patient is permanent and stationary. He has returned to his pre injury state without residual. There is no disability associated with this injury. WORK STATUS: Regular.

AR at 276.

On February 5, 2002, Plaintiff saw Dr. William Shaeffer because Dr. Lewis was not available. AR 274. Plaintiff reported that he had reinjured his right knee playing golf the previous week. *Id.* Dr. Shaeffer observed the following:

> Some tenderness over the anterior portion. No indication of swelling of the knee. Range of motion is essentially 95% of normal. No crepitus is noted . . . . No major abnormalities pending final report by radiology.

*Id.*

Plaintiff returned to see Dr. Lewis the next day. AR 272. In his notes, Dr. Lewis did not mention the reinjury and observed as follows:

> Vital signs are stable. Patient is in no acute distress . . . . Inspection of the knee reveals no acute swelling. Subjective complaints of a moderate tenderness is noted over the superolateral aspect of the patella. Range is normal. No crepitation is noted. Valgus and varus stressing, anterior and posterior drawer, Lachman's and pivot-shift are negative. Neurovascular status of the extremity is intact. ASSESSMENT: Possible tenosynovitis . . . with no significant findings on physical exam . . . . WORK STATUS: Regular.

AR at 272.

On the same day, Dr. Matthew Nickels examined Plaintiff's right knee and concluded that:

> Examination of the right knee in the anteroposterior, oblique, and lateral projections and comparing to a previous examination from 11/12/2001 again fails to reveal evidence of fracture or dislocation. The joint space is preserved. There is no evidence of a joint effusion.

AR at 273.

Plaintiff has also had problems with his left knee, leading him to have surgery on his left knee at Valley Memorial Hospital in September of 1989 in Livermore, California. AR at 88. The surgery was performed by Dr. George Batten. AR at 91. Plaintiff testified that his left knee pain continued and he wore knee pads at work during the two years prior to his onset date to help with the pain in his knees. AR at 367.

Plaintiff takes glucosamine and chondroitin for his knee stiffness. AR at 121-22.

### 3. Plaintiff's Arthritic Pain

Plaintiff claims that arthritic pain in his hands limit his ability to perform everyday tasks. AR at 367. According to Plaintiff, Dr. Louie has prescribed Capsicum Oleorsin for Plaintiff's arthritis. AR at 122. Although Dr. Louie referenced Plaintiff's arthritis in his declaration (described below), there appears to be no reference to arthritis in the doctor reports contained in the record.[1]

### 4. Plaintiff's Asthma

Plaintiff has a history of asthma, for which he has received treatment from Dr. Louie and Dr. Devendra Chhatre. AR at 111, 86. He takes Qvar daily for his asthma as well as Albuterol and Serevent during asthma attacks. AR 111. Plaintiff reports that he has approximately three asthma attacks a year but that he has never been to the emergency room or hospitalized because of an asthma attack. AR at 111. Plaintiff claims his breathing problems were aggravated by diesel fumes and jet exhaust he encountered while performing his job. AR at 367. Contact with perfume and solvents also aggravate his breathing difficulties. *Id.* On February 28, 2000, Dr. Revels Cayton wrote that because of Plaintiff's occupational asthma, he is "precluded from exposure to diesel fumes, jet exhaust, and solvents." AR at 217.

---

[1] The Court notes that the brief comments contained on Dr. Louie's reports are almost completely illegible.

6

### 5. Plaintiff's Ankle Pain

According to Plaintiff, a Dr. Coburn performed one of two ankle surgeries on Plaintiff's left ankle in 1999. AR at 92. There are no doctor reports of Plaintiff's ankle surgery in the record. Plaintiff takes glucosamine, Aleve, and chondroitin for his ankle stiffness. AR at 121-22.

### 5. The Louie Declaration

Prior to the hearing, Plaintiff submitted to the ALJ a declaration by his treating physician, Dr. Louie. AR at 358. The declaration was obtained via telephone in a conversation between Plaintiff's counsel and Dr. Louie. AR 316-323. Although the declaration does not state the date on which the conversation occurred, Plaintiff states in his motion – and Defendant does not dispute – the conversation occurred on August 7, 2004. Dr. Louie stated that he had treated Plaintiff since April 1999 for back pain, knee pain, asthma and osteoarthritis. AR at 317. As a result of these problems, Dr. Louie stated, Plaintiff in 2003:

> could not have worked a full eight hours . . . without a significant amount of work modification . . . he would have needed to take a lot of breaks . . . . Out of every hour he would need a fifteen minute break . . . . he's not going to stand for a prolonged period of time or sit for a prolonged period of time.

AR at 318-19. Dr. Louie also stated that Plaintiff would not be able to use his hands continuously for more than twenty minutes, that the osteoarthritis on his hands is severe, and that in general, "from what he [Plaintiff] described to me, the duties of . . . being the aircraft mechanic, it would be difficult for him to go over to work . . . ." AR at 320-21. As to how that compared to August of 2004, Dr. Louie stated "I think his back and his hand arthritis are not significantly better compared to 2003 . . . so he would still need to take a lot of breaks." AR at 319.

### B. The Administrative Hearing

The ALJ held an administrative hearing on Plaintiff's claim for disability insurance benefits on July 15, 2004. Present at the hearing were Plaintiff, Plaintiff's counsel Jason Surlin, and VE Dennis Contreras. AR at 358. The ALJ noted that the Louie declaration (discussed above) was unsigned due to Dr. Louie's unavailability. AR at 358. The ALJ stated, however, that he would accept the declaration into the record nonetheless. AR at 358-59.

7

The VE testified that Plaintiff's position as an aircraft mechanic has "medium" strength requirements, and that there would not be any transferable job skills from that job to either the light or sedentary levels of exertion. AR at 362. The VE confirmed that any skills Plaintiff developed were "industry-specific to that type of work," and that Plaintiff's job could not be performed if Plaintiff had an option to sit or stand at will. *Id*. The VE also testified that Plaintiff's job could not be performed if the individual was precluded from exposure to diesel fuel, jet exhaust, or other solvents. AR at 363-364.

Plaintiff testified that his back pain was constant, and caused him to only get two hours of sleep at a time, six hours total per night. AR at 366. He testified that he is tired during the day, and takes an average of two naps a day for an hour or an hour and a half. *Id*. Plaintiff testified that outside of work he is unable to cook, clean, or shop. AR at 368. He also claimed to experience pain when buttoning his pants, opening soda bottles and cans, and driving. AR at 367-369. Plaintiff testified that he cannot stand for more than 20 minutes at a time, that he can sit for no more than 30 minutes at a time, and that he can walk no more than a block's distance. AR at 369. At the time of the administrative hearing, Plaintiff was taking Vicodin around twice a week and Flexeril on a nightly basis for pain. AR at 376. After taking the medication, he usually naps for an hour or longer. AR at 377.

The ALJ requested records of updated pulmonary function testing from Mr. Surlin at the end of the hearing, which were provided to the ALJ on August 10, 2004. AR at 351-355 (Ex. 18F).

**C.   The ALJ's Five-Step Analysis and Findings of Fact**

Under the Social Security Act, disability insurance benefits are available when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). An individual claimant will only be considered disabled if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

8

42 U.S.C. § 423(d)(2)(A). The burden of proof in establishing a disability must be carried by the claimant. 20 C.F.R.§ 404.1512; *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996), *cert. denied*, 519 U.S. 881 (1996).

There is a sequential five-part evaluation process established by the Commissioner that determines whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers the claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in "substantial gainful activity," the Commissioner will find the claimant not disabled, and the evaluation ends. *Id*.

At Step Two, the Commissioner considers the "medical severity" of the impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant's impairment or combination of impairments does not significantly limit the claimant's "physical or mental ability to do basic work activities," then the Commissioner will find that the impairments are not severe, and therefore, that the claimant is not disabled. 20 C.F.R. § 404.1520(c). Age, education, and work experience are not considered in this step. *Id*. In addition, the second step involves a duration requirement: the physical or mental impairment (or combination of impairments) must have lasted, or must be expected to last, for a continuous period of 12 months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. If the duration requirement is not met, the Commissioner finds the claimant not disabled, and the evaluation ends at this step.

At Step Three, the Commissioner considers whether the claimant's impairment or impairments "meets or equals" one of the Social Security Administration's compiled listing of impairments that the Commissioner has established as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets one of these listed impairments, the Commissioner will find the claimant disabled. If the impairment does not meet one of the listed impairments, the process continues to the fourth step.

Step Four involves the consideration of whether the claimant, in light of his residual functional capacity ("RFC"), can continue to perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). Based on relevant medical evidence, and other evidence in the record, the Commissioner will assess the claimant's RFC to determine whether the claimant can do his past

work. 20 C.F.R. § 404.1520(e). If the RFC assessment determines that the claimant can perform his past work, the Commissioner will find him not disabled. 20 C.F.R. § 404.1520(f). If the RFC assessment determines that the claimant cannot perform his past work, then the claimant proceeds to the fifth step of the evaluation.

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner will find him disabled. *Id*. At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, and work experience, can adjust to other work in the national economy, and that such a job actually exists. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

In this case, the ALJ found at Step One of the evaluation process that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of disability (November 1, 2002). AR at 17. At Step Two, the ALJ found that Plaintiff "does not have any impairment or impairments that significantly limit his ability to perform basic work-related activities; therefore, the claimant does not have a 'severe' impairment" under 20 C.F.R. § 404.1520. AR at 17, 21. In particular, he concluded that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." AR at 17. The ALJ gave the Louie Declaration "no significant weight" on the basis that it was unsigned and that the statements in it were "unsupported." AR at 19. The ALJ also noted that the records submitted following the hearing, rather than supporting Dr. Louie's statements regarding Plaintiff's asthma, showed Plaintiff's asthma to be "well controlled." *Id*.

The ALJ also found that Plaintiff's testimony regarding chronic pain was not "wholly credible." AR at 19. He noted that although Plaintiff testified that he stopped working because of his pain, a report by Dr. Chhatra states he told her his job "terminated." *Id.* (citing AR at 240). The ALJ also noted that Plaintiff was playing golf when he allegedly was experiencing pain in his right knee, apparently referring to the report by Dr. Shaeffer, dated February 5, 2002, that Plaintiff reinjured his knee when he was playing golf. *Id.* (citing AR at 274). The ALJ also observed

10

Plaintiff at the hearing "to be a healthy appearing individual in no apparent distress," noting that he did not base his decision or credibility determination solely on this appearance. *Id*. The ALJ further noted that Plaintiff's treatment records indicate Plaintiff is not receiving treatment consistent with chronic pain syndrome. AR at 19. He noted that there was no evidence of adverse side-effects from Plaintiff's medications. *Id.* He also found that there was no evidence that Plaintiff was unable to care for his personal basic needs. *Id*. The ALJ found Plaintiff's pain testimony to be "somewhat vague in terms of onset, duration and severity." *Id*.

Because the ALJ concluded Plaintiff had not met the requirements of Step Two, he did not continue to the subsequent steps of the five-step analysis.

### D. The Motions

Plaintiff asserts that the ALJ erred in concluding at Step Two that his impairment is not severe. Specifically, Plaintiff asserts the ALJ erred by: 1) discounting the opinion of his treating physician, Dr. Louie, regarding the severity of his impairments; and 2) failing to completely credit Plaintiff's own testimony regarding the degree of pain he experiences.

Defendant, on the other hand, asserts that the ALJ properly found that Plaintiffs' combination of impairments is not severe because there is substantial evidence to support that conclusion. Defendant asserts that the ALJ's rejection of Dr. Louie's opinion was proper because there was medical evidence in the record that contradicted Dr. Louie's opinion regarding Plaintiff's asthma, namely, reports concerning Plaintiff's pulmonary functioning. Finally, Defendant asserts that the ALJ's rejection of Plaintiff's pain testimony was proper because the ALJ cited specific reasons for his finding, including evidence that Plaintiff did not stop working in November 2002 because he was unable to work but rather, because he was terminated. *See* AR at 240 (report by Dr. Chhatra, dated 1/28/03, in which she states that Plaintiff told her that his job with Fed Ex "terminated" in November 2002 and that she was "unable to make a determination" that Plaintiff was disabled due to his asthma).

## III. ANALYSIS

### A. Legal Standard

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and "supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla" but "less than a preponderance." *Id.*; *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when using the evidence to reach a decision. *Benitez. v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen*, 80 F.3d at 1279.

### B. The ALJ's Finding that Plaintiff's Impairments are Not Severe

Step Two of the ALJ's analysis requires that the claimant have a "severe" impairment. 20 C.F.R. § 404.1520(c). For an impairment (or combination of impairments) to be "severe" it must significantly limit the claimant's physical or mental ability to do "basic work activities." *Id.* The Social Security Act defines "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Such abilities include "'physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.'" *Bowen v. Yuckert*, 482 U.S. 137 (1987) (quoting 20 C.F.R. § 404.1521(b)). The Social Security Regulations state that "an impairment(s) is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner." SSR 96-3p. "Unless [the claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.

#### 1. Dr. Louie Declaration

More weight should be given to the opinion of a treating physician than a non-treating physician. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987). When a treating physician's

opinions are controverted, as here, the ALJ can only disregard the treating physician's opinions by making "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). The ALJ has met this standard in rejecting the statements made by Dr. Louie in his declaration. The ALJ explained in his decision that the declaration of Dr. Louie was "unsupported by physical or clinical findings or treatment records." AR at 18. Having carefully reviewed the record, the Court concludes that this is a legitimate reason for rejecting the statements made by Dr. Louie and is supported by substantial evidence.

First, with respect to Plaintiff's asthma, there is evidence in the record, cited by the ALJ, that it is well controlled. AR 352-355. Second, with respect to Plaintiff's knee pain, the evidence shows that Plaintiff's injury of November 12, 2001 was "resolved" as of November 26, 2001. AR at 275. In particular, Dr. Lewis stated that Plaintiff had "no soreness or pain," "complete mobility" and had "returned to his pre-injury status without residual." *Id*. With respect to a subsequent reinjury of his knee, examination of Plaintiff's knee by both Dr. Louie and Dr. Nickels on February 5, 2002 revealed no swelling or any other abnormality. AR at 272-273. With respect to Plaintiff's back problems, the record shows that Plaintiff underwent surgery many years before the alleged onset date and later experienced a flare-up in January and February of 2003. However, an assessment in April 2003 by Dr. Williams on behalf of the Social Security Administration revealed no exertional, postural, or environmental limitations. AR at 297 - 304. Dr. Williams noted that Plaintiff had experienced a flare-up of his back pain but concluded he would recover "within one year." AR at 298. Finally, there is no evidence of treatment for arthritis in Plaintiff's medical records.

### 2. Rejection of Plaintiff's Pain Testimony

Unless there is affirmative evidence that a claimant is malingering, an ALJ's reasons for rejecting the claimant's pain testimony must be clear and convincing. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). An ALJ may not rely solely on a lack of objective medical evidence to corroborate the claimant's pain testimony. *Id*. The ALJ must specify what testimony is not credible and identify the evidence that undermine's the claimant's complaints. *Id*. The ALJ may "engage in ordinary techniques of credibility

1  evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in

2  claimant's testimony." *Id*.  In addition, SSR 88-13 lists a number of factors the ALJ may consider:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication; 4. Treatment, other than medication, for relief of pain; 5. Functional restrictions; and 6. The claimant's daily activities.

*Id*. (quoting SSR 88-13).

Here, the ALJ set forth clear and convincing reasons for rejecting the claimant's pain testimony: he did not find significant limitations in Plaintiff's daily activities, he found no evidence of side-effects from Plaintiff's medications, he found Plaintiff's treatment to be inconsistent with chronic pain and he found Plaintiff's pain allegations to be "vague."  He also based his determination on specific evidence that caused him to question Plaintiff's credibility, namely, evidence that Plaintiff left his job in November 2002 because it terminated and not because he could no longer work; and evidence that Plaintiff continued to play golf after his alleged onset date. Therefore, the Court concludes that the ALJ did not err in rejecting Plaintiff's pain testimony.

**IV.   CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment.  The decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: August 30, 2006

_____
JOSEPH C. SPERO
United States Magistrate Judge